***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Chief Deputy Commissioner Stephen T. Gheen and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and amend the Opinion and Award. Accordingly, the Full Commission reverses the Opinion and Award of Chief Deputy Commissioner Gheen and awards benefits as follows.
 ***********
The following findings of fact and conclusions of law were entered into by the parties by Pretrial Agreement as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Worker's Compensation Act.
2. RISCORP NATIONAL was the carrier on the risk at the time in question.
3. Plaintiff's average weekly wage at the time, including overtime and all allowances was $260.00, which yields a compensation rate of $173.33.
4. Defendants (hereinafter collectively "Cherry's") denied compensation to Sledge for weekly benefits and medical payments, pursuant to an Industrial Commission Form 61 dated February 23, 1998.
5. The parties stipulate that the following documents are authentic and genuine and are hereby stipulated into evidence as Exhibits:
a. Stip. A: Industrial Commission Form 33.
b. Stip. B: Industrial Commission Form 33R.
c. Stip. C: Industrial Commission Form 61.
 d. Stip. D: Records from Bloem Orthopaedic Center, P.A., 13 pages.
 e. Stip. E: Records from Boice-Willis Clinic, P.A., 32 pages.
 f. Stip. F: Records from Carolina Regional Orthopedics, 3 pages.
 g. Stip. G: Records from Edgecombe-Nash Mental Health Center, 22 pages.
h. Stip. H: Records from Nash Day Hospital, 4 pages.
 i. Stip. I: Rocky Mount Family Medical Center, 9 pages.
 j. Stip. J: Records from Wilson Orthopaedic Surgery and Neurology Center, P.A., 8 pages.
 *********** EVIDENTIARY RULINGS
Cherry's counsel objected to the causation and increased risk questions posed of Dr. Whitmer by Sledge's counsel. The facts in Sledge's hypothetical question were essentially accurate despite the lack of specificity as to the length of time that Sledge worked in these activities on a daily basis as well as omitting the amount of time that Sledge had worked at Cherry's. The hypothetical questions are adequate in form and directed to elicit expert medical opinions material to the central issues at issue. Cherry's objections are OVERRULED.
 ***********
Based upon the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Sledge was 40 years old on the date of the hearing before the Deputy Commissioner. She has a ninth grade education and could write but not read. Her employment history includes work as a sharecropper, housekeeping in the motel industry, warehouse laborer and work in barbecue restaurants as a cashier and later as a kitchen worker.
2. Sledge had a history of medical conditions preexisting her employment at Cherry's, including, but not limited to hypertension, obesity, chronic low back pain and chronic depression. Sledge testified that she did not have any pain in her hands or arms preexisting her employment at Cherry's. The May 30, 1997, office note of Dr. Gilbert Whitmer, however, indicates "She reports a long-standing problem with bilateral hand pain, numbness, and swelling. It has grown steadily worse over the past few months."
3. Immediately prior to employment at Cherry's, Sledge worked at Gardner's Barbecue (hereinafter "Gardner's") for approximately eight years as a cashier, with an intervening year sabbatical during the fourth year related to childbirth and child rearing. She did not have kitchen duties at Gardner's.
4. Cherry's employed Sledge in February of 1997. She started as a cashier, and performed cashier duties until about three weeks later. As a cashier, Sledge primarily used her right hand. After three weeks as cashier, Sledge was promoted to assistant kitchen manager. Sledge's duties as an assistant kitchen manager were varied. Some of her duties requiring repetitive motion of the hands were:
 a. Making hushpuppies: This duty required Sledge to lift 25 pound bags of cornmeal. Sledge mixed the hushpuppies by hand in a pan that was 9 inches to a foot deep and approximately 2-1/2 feet long. Forming the hushpuppies required repetitive use of Sledge's hands in a gripping motion. Sledge would mix two batches of hushpuppies in the mornings and two in the afternoon for approximately twenty minutes per batch.
 b. Preparing chicken: Sledge removed the chicken from where it was packed in ice in cold storage and would batter it for frying. Two batches of chicken were made a day, one in the morning and in the afternoon. In the morning, she would batter approximately seven pans of chicken, taking approximately one hour.
 c. Frying chicken and hushpuppies: Pieces of battered chicken were placed into deep fryer baskets then lifted, submerged and removed when cooked. Lifting the chicken into and out of the deep fryer required the use of both hands and rotation of the hands to pour the cooked chicken onto a cooling area. Sledge would deep-fry the chicken in the morning and at other times when cooks were not available. Four fry baskets were in use for chickens and for hushpuppies. Frying hushpuppies only required one hand to lift and empty a basket.
 d. Stocking: Sledge would stock food products generally associated with a restaurant. In particular, Sledge would process large, heavy cans of products, weighing some 20 pounds per can. Food stocks were delivered once a week and required approximately one hour to complete stocking.
5. Sledge began to experience difficulty in using her hands in or about May 1997, a little longer than 60 days after she started in the kitchen. In particular, she would unexpectedly drop the chicken battering pan. The difficulty with grasping became a daily occurrence. Sledge reported her problem to Cherry's management, who referred Sledge to a physician.
6. Dr. Gilbert Whitmer treated Sledge for her hand symptoms beginning on May 30, 1997, approximately 3 months after she began kitchen work. Sledge's hands were swollen, and Dr. Whitmer documented positive Tinel's and Phalen's signs in both hands, right greater than left, the latter being described as equivocal. Based on his examination and previous nerve conduction studies, Dr. Whitmer concluded that Sledge had "considerable" carpal tunnel syndrome of both hands and tendinitis in the back of her wrists. On a scale of 0 to 10, the latter being the most severe, Dr. Whitmer rated Sledge's CTS as a 7 or 8.
7. Sledge was treated conservatively with splints and prescription medications for one month. On June 27, 1997, Dr. Whitmer recommended CTS surgery on the left hand. The left hand was selected, as it was more symptomatic with radiating pain into the arm.
8. CTS surgery was performed on the left hand in July, 1997. By July 25, 1997, Sledge reported that she had some but not substantial relief from surgery.
9. Sledge initially continued employment at Cherry's, the latter altering her duties to conform to her restrictions. Cherry's soon reduced Sledge's hours of work because she could not perform her full range of duties. Sledge left Cherry's in the latter part of July, 1997 because she could not earn enough money during her reduced hours.
10. In August, 1997, Dr. Whitmer believed, and the Full Commission finds as fact, that Sledge could no longer perform work that required heavy or repetitive use of her hands. She was restricted to lifting no more than 15 pounds. Dr. Whitmer specifically opined, and the Full Commission finds as fact, that Sledge could not perform her duties at Cherry's because of the painful condition of her hands and arms because of her compensable carpal tunnel syndrome.
11. Dr. Whitmer performed a battery of relevant medical tests to rule out other causes for Sledge's symptoms. He concluded that her painful condition was caused by her strenuous use of her hands and arms while working in the kitchen at Cherry's. She also concluded that her work at Cherry's placed her at an increased risk for carpal tunnel syndrome.
12. Dr. Whitmer did not recommend CTS surgery on Sledge's right hand because of Sledge's failure to obtain significant relief from the CTS surgery on her left hand. Dr. Whitmer prescribed pain medication. Sledge did not seek further medical treatment with Dr. Whitmer after November 17, 1997. Dr. Whitmer had not assigned any disability ratings for Sledge's CTS at the time he last treated her.
13. During his deposition testimony, Dr. Whitmer assigned a 15 percent disability to both hands.
14. Sledge returned to her family physician and was referred for further evaluation. Subsequent evaluations confirmed the presence of bilateral CTS with a recommendation for a right hand CTS release.
15. Dr. Josephus Bloem of Bloem Orthopedics Center treated Sledge for her hand symptoms beginning on June 26, 1998. Sledge was experiencing similar symptoms as reported to Dr. Whitmer. Dr. Bloem confirmed, with supporting nerve conduction studies, that Sledge had CTS bilaterally. Dr. Bloem did not believe that further conservative treatment was warranted.
16. Dr. Bloem performed a CTS release on Sledge's right hand on July 14, 1998. By September, 1998, Sledge had some improvement in her right hand, but she still suffered substantial symptoms including continuing pain into the arms to the shoulders. Nerve conduction studies confirmed some improvement had occurred, but Sledge's hand did not return to normal. Dr. Bloem observed during this period that Sledge is obviously and highly depressed.
17. Sledge continued to experience significant symptoms throughout 1998. On December 21, 1998, Dr. Bloem assigned a 10 percent disability rating to both arms. Dr. Bloem restricted Sledge from employment requiring repetitive use of her hand and elbows.
18. Sledge returned to Dr. Bloem periodically in 1999, as well as having other orthopedic evaluations arranged by her family physician. All subsequent evaluations confirmed the presence of continuing CTS. Dr. Bloem noted that the only viable, but low probability, option medically available was additional CTS surgery. Dr. Bloem prescribed splints and injected the left wrist.
19. As of the date of hearing before the Chief Deputy Commissioner, Sledge continued to have swelling and numbness in her hands. Additionally, she had some loss of strength.
20. Dr. Bloem, in a letter to Sledge's counsel and during his deposition testimony, assigned a 20 percent permanent disability rating to each arm, which the Full Commission finds to be reasonable. Dr. Bloem relied on guidelines from the Fourth Edition of the AMA Guide because the North Carolina Workers' Compensation Guide did not afford sufficient options for rating Sledge who has symptoms beyond the hand. As of December 20, 1999, Dr. Bloem restricted Sledge from repetitive employment that presented high risk for aggravation of her CTS. Dr. Bloem stated that his previous ratings of 10 percent to both arms were in error given his evaluation of her residual symptoms, especially involving symptoms into the arms. The end of the healing period was December 20, 1999.
21. Sledge's counsel asked a series of questions of Dr. Whitmer to elicit his opinion as to causation of Sledge's CTS and risk of exposure to CTS at Cherry's in comparison to the general population. Dr. Whitmer, prior to his deposition, was only aware that Sledge was an assistant manager at a restaurant. The specific facts initially provided to Dr. Whitmer by Sledge's counsel were:
 Ms. Sledge has stated at hearing that her job entailed food preparation which included lifting twenty-five pound meal bags, mixing hushpuppies with her hands, lifting large deep fryers, stacking shelves with canned goods, lifting cased and uncased frozen chicken from containers in order to be fried usually in fifty gallon barrels, and battering chicken.
Based on these facts, Dr. Whitmer opined that Sledge's employment at Cherry's would have placed her at greater risk than the general public for the development of CTS and could have aggravated Sledge's CTS.
22. Cherry's counsel posed the following facts regarding Sledge's duties to Dr. Whitmer:
 I want you to assume that Ms. Sledge began working for Cherry's Barbecue at the end of March 1997, on March 28th, 1997, to be exact, which would have been approximately one month before she first saw you, and when she first began working there she worked as a cash register operator and she did this through April 30th of 1997. At that time she was promoted to assistant kitchen manger and she remained in that job from April 30th of 1997, through sometime in June of 1997. While she was a cash register operator what she did, obviously, was operate the cash register and everything that job would entail. And when she moved into the assistant kitchen manager job, that job involved preparing pans of hushpuppies in which she would prepare four pans per day and would mix hushpuppy mix. It would take fifteen to twenty minutes per pan. And she also had to batter chicken which she had to put into a pan in order to put it into the fryer, and she would periodically turn the fryers and she would do those duties for short periods of time periodically through the day.
Dr. Whitmer, based on these facts, expressed an opinion that Sledge's job at Cherry's would not have increased her risk for developing CTS compared to members of the general public and her duties would not be sufficiently repetitive within that short period to cause the CTS. However, the facts given in the hypothetical were wrong. Cherry's employed Sledge in February of 1997. She started as a cashier, and performed cashier duties until about three weeks later, when she was promoted to assistant kitchen manager. Sledge's duties as an assistant kitchen manager were varied. Some of her duties requiring repetitive motion of her hands. She was exposed approximately 60 days longer to repetitive use of her hands than defendants' hypothetical set out and long enough so that Dr. Whitmer's earlier response of increased risk and causation is applicable. The Full Commission gives greater weight to Dr. Whitmer's earlier answers since they were based on a hypothetical that was far closer to the facts.
23. Dr. Bloem, prior to his deposition, was not specifically familiar with Sledge's duties at Cherry's. Sledge's counsel presented Dr. Bloem with the following facts regarding her employment:
 Ms. Sledge has described her job as requiring the use of her hands including activities such as making hushpuppies at Cherry's . . . which required a kneading an actual kneading of the batter with her hands, continuous lifting of heavy skillets and other utensils, and also the battering of other [chicken] and also using her hands to move great amounts of chicken parts that were in frozen partially frozen.
From this set of facts, Dr. Bloem opined that Sledge could have developed CTS from her employment at Cherry's.
24. Cherry's counsel presented Dr. Bloem with facts regarding Cherry's employment consistent with the facts presented to Dr. Whitmer noted ante, which were wrong. Dr. Bloem maintained his opinion that even given the short period of time that Sledge was employed at Cherry's could be a significant factor in causing Sledge's CTS but admitted that "if [Dr.] Whitmer has a strong other opinion, then that is probably the choice you take." When presented with the additional fact that Sledge had worked at Gardner's Barbecue for some years, Dr. Bloem expressed the opinion that Sledge's CTS probably developed while at Gardner's and that her employment at Cherry's aggravated her symptoms. The Full Commission finds that plaintiff's last injurious exposure was at Cherry's.
27. Sledge's statements to Dr. Whitmer early in the treatment cycle clearly indicate that her symptoms preexisted employment at Cherry's. Given the severity of Sledge's bilateral CTS, the short duration of her employment at Cherry's and her limited duties involving repetitive use of the hands, Sledge's CTS preexisted her employment at Cherry's but Cherry's was her last injurious exposure.
28. Sledge has proven by the greater weight of the evidence that she suffers from bilateral CTS, which preexisted her employment with Cherry's, that her last injurious exposure was at Cherry's and that her CTS has resulted in incapacity to work at her former employment at Cherry's.
 ***********
Based upon the forgoing Stipulations and Findings of Fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish her CTS as an occupational disease, Sledge must prove by the greater weight of the evidence that she (1) suffers from a compensable occupational disease and (2) was last injuriously exposed to the hazards of such disease while employed by defendant.Rutledge v. Tultex Corp., 308 N.C. 85, 89, 301 S.E.2d 359, 362-63
(1983). Sledge bears the burden of proving every element of compensability. Gibbs v. Leggett and Platt, Inc., 112 N.C. App. 103,107, 434 S.E.2d 653, 656 (1993). The degree of proof required of a claimant under the Act is the "greater weight" or "preponderance" of the evidence. Phillips v. U.S. Air, Inc., 120 N.C. App. 538, 541-42,463 S.E.2d 259, 261 (1995), aff'd, 343 N.C. 302, 469 S.E.2d 552 (1996). Sledge has met these burdens.
2. To establish a right to benefits under the Act for an occupational disease under N.C. Gen. Stat. § 97-53(13), Sledge must show: (1) the disease is characteristic of individuals engaged in the particular trade or occupation in which the claimant is engaged; (2) the disease is not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there is a causal relationship between the disease and the claimant's employment. Rutledge, 308 N.C. at 93, 301 S.E.2d at 365.
3. Sledge has proved by the greater weight of the evidence that she has a compensable occupational disease related to her employment at Cherry's. She produced competent evidence that the particular duties characteristic in her employment as performed at Cherry's exposed her to a greater risk of developing CTS than members of the public generally and constituted her last injurious exposure. N.C. Gen. Stat. § 97-53(13);Rutledge v. Tultex Corp./Kings Yarn, 308 N.C. 85, 301 S.E.2d 359 (1983);Minter v. Osborne Co., 127 N.C. App. 134, 487 S.E.2d 835 (1997); Norrisv. Drexel Heritage Furnishings, Inc./Masco, 139 N.C. App. 620,534 S.E.2d 259 (2000) (expert testimony required to prove "increased risk").
4. Defendants are responsible for all medical treatment reasonably required to effect a cure, provide relief or shorten the period of disability, including both carpal tunnel surgeries. To the extent that Sledge continues to need treatment with respect to her compensable injuries, defendants continue to be required to provide it. N.C. Gen. Stat. §§ 97-25 and 97-25.1.
5. Plaintiff is entitled to compensation at the rate of $173.33 per week for each period of time she was unable to earn wages by reason of her occupational disease, including the time she was unable to work because of the two surgeries. At the end of the healing period, i.e., December 20, 1999, she is entitled to make an election between continuing disability payments of $173.33 per week (with appropriate offsets for any amounts she was able to earn) or her disability rating of 20% to each arm, equating to 96 weeks of disability compensation which is $16,639.68. N.C. Gen. Stat. §§ 97-29, 97-30 and 97-31.
 ***********
Based upon the forgoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay for all medical treatment (past, present and future) reasonably required to effect a cure, provide relief or shorten the period of disability, including both carpal tunnel surgeries. To the extent that Sledge continues to need treatment with respect to her compensable injuries, defendants shall continue to provide it.
2. Defendants shall pay to plaintiff $173.33 per week for each week plaintiff was unable to earn wages because of her compensable occupational disease. Such amount that has accrued shall be paid in a lump sum. Plaintiff shall make an election as between continuing disability of $173.33 per week until such time as she is able to return to work at the same or greater wages, partial disability for wage difference for the 300 weeks following July 1997, or her rating compensation of $16,639.68.
3. Plaintiff was represented by counsel at the hearing before the Deputy Commissioner. Inasmuch as counsel withdrew at such time as plaintiff's claim had been ruled not compensable, her counsel is not entitled to an attorney fee.
4. Defendants shall pay the costs.
This 2nd day of April 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/____________ RENEE RIGGSBEE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER